IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

FRANCIS NGUESSI DAME,

    Petitioner,

    v.

WARDEN CHRISTOPHER SMITH,
ATTORNEY GENERAL BRIAN E. FROSH,

    Respondents.

Civil Action No.:  ELH-21-3038

**MEMORANDUM OPINION**

Petitioner Francis Nguessi Dame, a Maryland prisoner, has filed a Petition For Writ of Habeas Corpus.  ECF 1 (the "Petition").  Respondents are Warden Christopher Smith and the Maryland Attorney General, who filed an answer to the Petition, asserting that the claims are procedurally defaulted and without merit.  ECF 5.  Their submission includes several exhibits. Petitioner filed a reply. ECF 11.

No hearing is required.  *See* Rule 8(a), *Rules Governing Section 2254 Cases in the United States District Courts* and Local Rule 105.6 (D. Md. 2021); *see also Fisher v. Lee*, 215 F.3d 438, 455 (4th Cir. 2000) (petitioner not entitled to a hearing under 28 U.S.C. § 2254(e)(2)).  For the reasons that follow, I shall deny the Petition.  And, a certificate of appealability shall not issue.

## I.    Procedural Background

Dame was charged on August 26, 2016, in the Circuit Court for Harford County, with two counts of sexual abuse of a minor and one count of engaging in child sexual abuse in a continuing course of conduct over a period of 90 days or more.  ECF 5-1 at 12-13.  After a jury trial, presided over by the Honorable M. Elizabeth Bowen, Dame was convicted on May 12, 2017, of all three

counts.  ECF 5-1 at 1.  On September 7, 2017, he was sentenced to 25 years' incarceration for sexual abuse of a minor by a household member, which was merged with the sentence for sexual abuse of a minor by a person having temporary care, custody, or responsibility of a minor.  *Id.* at 5-7, 14.  He was also sentenced to 30 years' incarceration for sexual abuse of a minor in a continuing course of conduct, which was imposed consecutively, but suspended.  Thus, Dame was sentenced to a total sentence of 55 years' incarceration, with all but 25 years suspended.  ECF 5-1 at 5-7, 14, 32, 185.  *Id.* at 5-6, 14.

On September 18, 2017, Dame filed a Motion to Reconsider Sentence pursuant to Md. Rule 4-245(e).  *Id.* at 25.  It remains pending.

Dame filed a timely notice of appeal.  *Id.* at 22.  He asked one question, *id.* at 33: "Did the trial court err and/or abuse its discretion in allowing the prosecutor to cross-examine Mr. Dame about a highly prejudicial text message that the prosecutor acknowledged was 'not admissible in evidence'"?

The Maryland Court of Special Appeals[1] issued an unreported opinion on February 5, 2019, affirming Dame's convictions.  *Id.* at 98-115.  The court held that the trial court acted within its discretion in allowing the questioning "because Dame's affirmative response obviated the need for extrinsic proof, and, in any case, the State could have proved that Dame solicited V.M. for sex via text messaging through V.M.'s testimony."  *Id.* at 99.  The court's mandate issued on March

---

[1] At the time Dame's case was litigated in the Maryland state courts, the "Court of Special Appeals" was the name of Maryland's intermediate appellate court, and the "Court of Appeals of Maryland" was the name of the State's high court.  At the general election of November 8, 2022, the voters of Maryland ratified a constitutional amendment changing the name of the Court of Appeals of Maryland to the Supreme Court of Maryland.  And, the name of the Court of Special Appeals was changed to the Appellate Court of Maryland. The name change took effect on December 14, 2022.  However, I shall refer to the courts by their names at the time the cited decisions were issued.

27, 2019. *Id*. at 140. Dame filed a timely petition for writ of certiorari to the Maryland Court of Appeals (*id*. at 116), which was denied on April 19, 2019. *Id*. at 142.

Dame, pro se, filed a petition for post-conviction relief on May 12, 2020. ECF 5-1 at 145. He asserted the following claims, *id.*:

I.      Trial counsel rendered ineffective assistance by failing to object to the prosecutor's "Golden Rule" argument.

II.     Trial counsel rendered ineffective assistance by failing to object to the prosecutor's soliciting testimony regarding Petitioner's arrest.

III.    Trial counsel rendered ineffective assistance by failing to object to the prosecutor's repetitive manner of questioning its key witness.

IV.     Trial counsel rendered ineffective assistance by failing to object to the prosecutor's improper cross-examination questions.

V.      Cumulative effect of trial counsel's errors.

A hearing was held on the petition on November 23, 2020. *Id.* at 189. Dame was represented by counsel. No witnesses were called to testify; only legal arguments were presented. *Id*. On March 17, 2021, the post-conviction court, Judge Kevin Mahoney, issued a written opinion in which he denied the petition for post-conviction relief. *Id*. at 189-201. I discuss the opinion, *infra*.

Dame filed a timely application for leave to appeal the denial of his post-conviction petition. *Id*. at 202-12. The application was summarily denied on July 28, 2021, with the court's mandate issuing on August 27, 2021. *Id*. at 214-16.

Dame filed the instant Petition on November 29, 2021. ECF 1. He asserts the following grounds: (1) "Trial Court erred and/or abused its discretion in allowing the prosecutor to cross-examine Mr. Dame about a highly prejudicial text message that the prosecutor acknowledged was 'not admissible as evidence.' Petitioner's right to Due Process of the Law was violated when the

Courts did not adhere to its own rules for its State's law"; (2) he received ineffective assistance of trial counsel, in violation of the Sixth Amendment, when his attorney "failed to make several objects [sic] during . . . trial." These include, according to petitioner, the following: a) the failure to object to the prosecutor's "Golden Rule" argument; (b) the prosecutor's solicitation of testimony regarding Dame's arrest; (c) the repetitive manner of questioning of the State's "key witness"; and (d) the failure of defense counsel to object to the prosecutor's "improper cross-examination question." Dame also asserts that (3) the cumulative effect of counsel's errors rendered Dame's trial unfair and unreliable. ECF 1 at 2-5.

## II. Factual Background

As noted, the Maryland Court of Special Appeals affirmed Dame's conviction. Judge Andrea Leahy, writing for the panel, recounted the facts, in detail, as follows, ECF 5-1 at 100-09 (alterations in original):

### The Family

V.M. was five years old when she and her older brother, F.J., came from Cameroon to join their mother in the United States in 2003. They lived with their mother and Dame, mother's boyfriend, who V.M. referred to as "Dad." Mother and Dame then had three children together: two daughters, I.D. and R.D., and a son, S.D. Mother worked two jobs while Dame worked sporadically in building maintenance and property management. While mother worked, V.M., the oldest daughter, and Dame, were largely responsible for raising the children.

V.M., mother, R.D., and I.D. described the family dynamic similarly. They related that Dame favored V.M., buying her clothes, accessories, jewelry, and food. According to mother, Dame would gladly take V.M. to her after school activities, but would not take F.M. to his, forcing mother to leave work to drive F.M. to his activities. And V.M. related that Dame would not pay attention to her siblings, but made sure that her "needs were met, very, very fast." Dame gave V.M. a key to the home mailbox so that she could pick up the items he purchased for her when she got home from high school, preventing her mother from finding out about those purchases.

**Sexual Abuse**

V.M. testified that Dame began molesting her when she was 10 years old. She had a detailed recollection of the first time: she wore a pink skirt and a blue shirt and was sleeping in the same bedroom as her sisters.  Dame entered her bedroom, sat on the side of her bed, and felt inside her underwear, in her crotch area, and on her butt.  From the time she was 10 years old until she was 16 years old, whenever Dame hugged V.M., he would "grind his penis against [her] vagina."  Dame also carried V.M., put her on his lap in front of a computer, and felt her "vagina and chest area."  The touching took place in the parents' bedroom, either in the closet or behind the bed.  In the beginning, V.M. disliked the touching but did not understand that it was wrong.  As V.M. grew older, Dame told her that he was her best friend and that the touching was normal.

Dame called V.M. to his bedroom verbally or by text, and told her to distract her siblings by turning on the TV, raising its volume, and putting food out for them. Dame's texts would instruct her to go to his room, saying "I'm feeling horny," or "I need help with this, can you come and see me."  Dame told V.M. to lock the door and would then check the door himself to ensure that it was locked properly.

When V.M. was 14 years old, Dame began to perform oral sex on her.  V.M. estimated that Dame performed oral sex on her at least 200 times.  Dame eventually forced V.M. to perform oral sex on him.  The next year, Dame began to vaginally rape her, three to four times per week, while mother was at work.  V.M. testified that the rapes began when Dame discovered that she was gay, so that he could "turn [her] straight."  He told her this was "the process."  The first few months of "the process" entailed reading Bible verses and reading about why being gay was wrong; the latter months entailed Dame raping V.M. so that she would experience "sexual intercourse with a man."  V.M. volunteered to have intercourse with a classmate, but Dame refused, insisting that she "had to do it with him because he was the most fit, he was the most experienced and he would know how to handle a woman."

V.M. described enduring these encounters by "laying [sic] in bed pretty much like dead," and said that Dame would scold her for not "participating."  He yelled at V.M. and asked, "[d]o you not want to turn straight?"  V.M. testified that the reason the family moved from Riverside to Havre de Grace was so that she could attend school in a different district away from her lesbian friends.  The rapes continued for about one year.  V.M. estimated that Dame raped her "[a]t least" 200 times.

Dame communicated with V.M. primarily through texts.  V.M. explained that Dame texted her "24/7, every day," and that "it was always him just screaming at [her] through the phone or planning to do something after school."  Dame would text V.M. even if she were at school, and sometimes the texts would make her cry and she would have to leave class.  Dame also texted her at odd hours of the night to come to his bedroom.  He preferred text to other forms of communication

because "he was afraid that someone could hear him say something." When V.M. was questioned by the State as to whether she and Dame used "any terminology or code words," V.M. replied "[w]ell, the two main [ ] ones were if he said come, then I know what that meant and then if he says the process, then I know that that meant him having sex with me to make me straight." The text messages were not saved because as soon as V.M. went to Dame, he would delete the messages first from her phone and then from his own.

Dame threatened to kill V.M. and hide her body if she ever told anyone about the sex. He also threatened to hurt her mother and siblings. These threats of violence occurred "at least every other week." Additionally, Dame told V.M. that if she told her mother about the sexual abuse, he would tell [her] mother that V.M. was gay. V.M. testified that Dame made her "believe that [her] Mom would be more angry at the fact that [she] liked girls [than] that he was touching me." V.M was very fearful that mother would not love her, kick her out of the house, and disown her for being gay.

R.D., I.D, and V.M. testified that Dame would take V.M. into the master bedroom or basement and lock the door for at least an hour, three to four times per week, while mother was at work. R.D. testified that she confronted Dame about the time spent locked in a room with V.M., and Dame shared that he was trying to convert V.M. from gay to straight.

V.M. exhibited personality and mood changes. Mother reported that when V.M. first arrived in the United States, she was a happy, playful child. Both I.D. and mother testified that V.M. became sad and withdrawn in her early teenage years, sleeping during the day, spending much time alone in her room, and speaking in a monotone. V.M. told mother that she had heart palpitations and was cutting herself. Mother sought medical treatment for V.M.'s anxiety. Mother thought that perhaps V.M.'s fatigue was attributable to staying up all night and talking on the phone. Mother knew something was "really, really wrong with her but [she] couldn't put [her] hands on it."

In 2015, when Dame was away in Cameroon for several months, V.M. finally confided in her mother that Dame had molested her for many years and had raped her as well. V.M. explained that she had documented the abuse in two journals. The first, Dame found and burned when V.M. was 12 years old. The second, V.M. wrote on her phone, recording from memory all the abuse that she had suffered from age 10 to 16. Mother described V.M. falling down and crying as she told her of the abuse. After telling her mother, V.M. disclosed the abuse to a social worker, under the observation of a police detective. Police arrested Dame at Dulles airport upon his return to the United States on August 20, 2015.

**The Text Messages**

The state's final witness was Detective Chester Norton of the Havre de Grace Police Department.  Detective Norton testified about his assignment to V.M.'s case.  He described executing a search warrant for Dame's cell phone, prompting defense counsel to object in the course of the following exchange:

[PROSECUTOR]: And you also got a search warrant in this case, correct?

[DET. NORTON]: Yes, sir.

[PROSECUTOR]: And that was for his—for his phone?

[DET. NORTON]: Yes, sir.

[PROSECUTOR]: And were you able to execute that search warrant?

[DET. NORTON]: Yes, sir.

[PROSECUTOR]: And were you able to retrieve a download from that phone?

[DET. NORTON]: Yes, sir.

[PROSECUTOR]: Were you able to read the text messages on that phone?

[DET. NORTON]: Yes, sir.

[PROSECUTOR]: And did anything stand out in your mind?

[DEFENSE COUNSEL]: Objection.

THE COURT: Approach.

(WHEREUPON, there was a conference at the bench with the Defendant present.)

[DEFENSE COUNSEL]: It is my understanding, Your Honor, that the—that he didn't do the download, that a technical expert at the Sheriff[']s Office did the download and then provided him with information in a short version and later in a longer version and I don't think he knows anything about the download other than what he was presented.  So I don't think he should be testifying to it as something firsthand.

THE COURT: All right. Mr. [Prosecutor]?

[PROSECUTOR]: That is correct.

7

THE COURT: All right. Sustained.  You can back up and make it clear who did the download.

[PROSECUTOR]: I'm going to end it there.  I was going to try to get in what he observed and view[ed] and read from the download.  The person who did the download is gone.  They are in New Zealand.

THE COURT: So your objection is to this being discussed at all?

[DEFENSE COUNSEL]: Well—

[PROSECUTOR]: I'm not trying to get it.  I'm not trying to admit the download. I'm trying to admit what he read from the Deputy.

[DEFENSE COUNSEL]: I would have objected to the download being [in] all together because it was done by an expert and apparently the State disclosed to me [ ] the State doesn't have that expert anymore.  But now, I am, since that is not going to happen, I am definitely objecting to any effort to have him report what he was provided by an expert's work.

THE COURT: Sustained.

The prosecutor subsequently changed subjects and focused his final line of questions on the timeline of Dame's arrest.

### Dame's Testimony

Dame testified in his own defense.  He denied ever inappropriately touching V.M., performing oral sex on V.M., forcing V.M. to perform oral sex on him, or raping V.M.  Dame claimed he became aware that V.M. was communicating with other girls and visiting websites containing images of nude women.  He was opposed to homosexuality and believed that, given her young age, V.M. "wasn't sure about what she want[ed] to do, she need[ed] something to clarify what she want[ed] to do."  According to Dame, he confronted V.M. about her sexuality and required her to write a note to "prove that [she was] willing to change."  He told her that she needed some type of help.  Using Google, Dame found a website to help V.M. overcome her attraction to women.  He described "the process" as requiring V.M. to read the materials he printed from the website and report to him on her progress.  Yet, during cross-examination, he could not remember the contents of the documents he required V.M. to read and report on.  He admitted that he and V.M. would meet in the living room, the study, or the bedroom, with the door shut and sometimes locked to conduct "the process" outside the presence of the other children.  Dame never informed mother or the other children about "the process."

On cross-examination, Dame acknowledged that he "often" sent text messages to V.M., but insisted that he texted with the entire family. Thereafter, the following exchange transpired among counsel, the court, and Dame:

[PROSECUTOR]: And did you ever text her for a quickie?

[DEFENSE COUNSEL]: Objection.

THE COURT: Approach.

(WHEREUPON, counsel approached the bench.)

THE COURT: Basis?

[DEFENSE COUNSEL]: If this text message is coming from the download that was done by the Sheriff[']s Office and the State has already indicated they are not putting it in evidence and now they are attempting to back door this by asking questions from it.  I don't think they should be allowed to do that.

[PROSECUTOR]: I'm certainly allowed to ask him the question if he ever tried to ask his daughter for a quickie.  If he says, no, at least I can try to do it through him. Still allowed to ask him.  Your daughter told me this; I have information from her and I have a copy of it.  Just because it is not admissible as evidence doesn't mean I can't use it to try and impeach him or ask him questions about it.

THE COURT: Overruled.

(WHEREUPON, proceedings resumed before the Jury.)

[PROSECUTOR]: You can answer the question.

[DAME]: What was the question?

[PROSECUTOR]: Did you text your daughter for a quickie[?]

[DAME]: About a cookie.  Not a quickie.  Yes.

[PROSECUTOR]: Yes?  I'm sorry.  I'm not trying to be rude.  I didn't understand you?

[DAME]: The answer is yes.

[PROSECUTOR]: Okay.  Thank you, Your Honor.  I have no further questions.

On redirect, defense counsel revisited the topic of the "quickie," in the following exchange with Dame:

[DEFENSE COUNSEL]: You were just asked whether you ever sent a text to [V.M.] saying something about a quickie; your answer was yes?

[DAME]: Yes, the question—I remember once a few times basically, we have this session of this thing where we work basically like a straight—it was text sometimes when she has all this document, when she has a bunch of them, maybe 10 or 20 pages working on it and actually this name role by.  So the process was coming from her and one day she came up with quickie.  She said, okay.  The day that I just come for a question about what is happening, at this particular part, it was like code name, it would be a quickie.  So basically that is what I understood by quickie. Regarding the time that we spoke about quickie, yes.  I don't know what you mean by quickie here.

[DEFENSE COUNSEL]: No further questions, Your Honor.

At that point, defense counsel renewed a motion for judgment of acquittal, arguing that the state had failed to establish a case before the jury as to all three counts.  The court denied the motion, concluding that "this is really a jury issue."

During closing arguments, the State made repeated reference to Dame's affirmative response to the question about the "quickie:"

The touching, the humping, the fact that he admitted on the witness stand he would send her text message[s] saying I want you to come for a quickie.  I don't care where you live on this planet, we all know what a quickie means.  That means a series of vaginal intercourse, a quickie, a quick period of time.

\* \* \*

And a quickie is a quickie, folks.  He admitted it.  He said it.  It came out of his mouth on the witness stand.  I don't care where you live on this planet, we all know what that means.

\*\*\*

And he gets her to remain silent.  It will destroy your mother if she finds out you are gay.  I'm going to tell her unless you do this stuff . . . .  You need to come to my room.  You need to come to my room for a quickie.

The jury convicted Dame of all three charges.  On September 7, 2017, Dame was sentenced to 25 years for sexual abuse of a minor by a household member, which was merged with the sentence for sexual abuse of a minor by a person having temporary care, custody, or responsibility for the supervision of that minor.  He was sentenced to 30 years, suspended, for the sexual abuse of a child under the age of 14 in a continuing course of conduct over a period of 90 days or more.  The court

ordered the sentences be served consecutively.  On September 13, 2017, Dame noted his timely appeal to this Court.

I include additional facts in the Discussion.

### III.    Standard of Review

The Petition seeks habeas corpus relief pursuant to 28 U.S.C. § 2254.  This Court may grant a petition for a writ of habeas corpus only for violations of the Constitution or laws of the United States.  28 U.S.C. § 2254(a); *see Wilson v. Corcoran*, 562 U.S. 1 (2010); *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991).  As the Court explained in *Larry v. Branker*, 552 F.3d 356, 368 (4th Cir. 2009): "[I]t is not the province of a federal habeas court to reexamine state court determinations on state law questions.  In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States."

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a federal court is precluded from granting habeas corpus relief "on a claim decided on the merits in a state court unless it determines the state court's decision was contrary to, or involved an unreasonable application of clearly established federal law or was based on an unreasonable determination of the facts in light of the record evidence.'"  *Crockett v. Clarke*, 35 F. 4th 231, 235 (4th Cir. 2022).  Moreover, the federal court's review of a State court decision under § 2254 is conducted "through a narrow lens . . . ," requiring a review of "the record in its entirety" as it existed before the post conviction court.  *Mahadi v. Stirling*, 20 F.4th 846, 854 (4th Cir. 2021); *see Mays v. Hines*, ___ U.S. ___, 141 S. Ct. 1145, 1149 (2021) (per curiam); *Hyman v. Hoekstra*, 41 F.4th 272, 274 (4th Cir. 2022).

A § 2254 petition must set forth specific grounds for relief.   *Samples v. Ballard*, 860 F.3d 266, 273 (4th Cir. 2017); *see also Folkes v. Nelsen*, 34 F.4th 258, 267 (4th Cir. 2022).  Claims by a State prisoner that he is in custody in violation of the Constitution or the laws of the United States

"implicate concerns about federalism and comity[."] *Crockett*, 35 F.4th at 241. Concerns of comity and federalism "reach their apex" when a state court has previously ruled on an alleged wrongful conviction. *Valentino v. Clarke*, 972 F.3d 560, 575 (4th Cir. 2020). Therefore, "the standard for such claims is exceedingly high." *Crockett*, 35 F.4th at 241; *see Burt v. Titlow*, 571 U.S. 12, 19 (2013). Indeed, the Fourth Circuit has characterized it as "an extraordinary standard of review." *Crockett*, 35 F.4th at 235.

Notably, "[t]he State possesses primary authority for defining and enforcing the criminal law, and for adjudicating constitutional challenges to State convictions." *Shinn v. Ramirez*, ___ U.S. ___, 142 S. Ct. 1718, 1730-31 (2022) (internal quotation marks and citations omitted). "The role of a federal habeas court is to guard against extreme malfunctions in the state criminal justice systems, not to apply *de novo* review of factual findings and to substitute its own opinions for the determinations made on the scene by the trial judge." *Davis v. Ayala*, 576 U.S. 257, 276 (2015) (internal quotation marks and citations omitted). Therefore, § 2254 "is not to be used as a second criminal trial, and federal courts are not to run roughshod over the considered findings and judgments of the state courts that conducted the original trial and heard the initial appeals." *Williams v. Taylor*, 529 U.S. 362, 383 (2000); *see Walters v. Martin*, 18 F.4th 434, 441 (4th Cir. 2021). Accordingly, the habeas court may not disturb a state court judgment "absent an error that lies beyond any possibility for fair-minded disagreement." *Mays*, 141 S. Ct. at 1146; *see Walters*, 18 F.4th at 441.

In *Nicolas v. Atty. Gen. of Maryland*, 820 F.3d 124, 129 (4th Cir. 2016), the Fourth Circuit explained (citing 28 U.S.C. § 2254(d)):

> The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) requires a federal court reviewing a habeas petition that has already been adjudicated on the merits in state court to give considerable deference to the state court decision. A federal court may not grant habeas relief unless the state court

arrived at "a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."

Factual determinations are unreasonable when they are "'sufficiently against the weight of the evidence . . . .'" *Williams v. Stirling*, 914 F.3d 302, 312 (4th Cir. 2019) (citation omitted). But, "'a state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance.'" *Titlow*, 571 U.S. at 18 (citation omitted).

Also of relevance, the habeas court "must presume that the state court's factual findings are correct unless the petitioner rebuts those facts by clear and convincing evidence." *Nicolas*, 820 F.3d at 129; *see also Harrington v. Richter*, 562 U.S. 86, 100-01 (2011); *Walters*, 18 F.4th at 442; 28 U.S.C. § 2254(e)(1). "Where the state court conducted an evidentiary hearing and explained its reasoning with some care, it should be particularly difficult to establish clear and convincing evidence of error on the state court's part." *Sharpe v. Bell,* 593 F.3d 372, 378 (4th Cir. 2010). This is especially true where the state court has "resolved issues like witness credibility, which are 'factual determinations' for purposes of Section 2254(e)(1)." *Id.*

For a state court's decision to be contrary to established federal law, the state court must have arrived at a conclusion opposite to that reached by the Supreme Court on a question of law, or must have confronted facts that are "materially indistinguishable from a relevant Supreme Court" case but nevertheless arrived at the opposite result. *Williams*, 529 U.S. at 405; *see Barnes v. Joyner*, 751 F.3d 229, 238 (4th Cir. 2014); *Lovitt v. True*, 403 F.3d 171, 178 (4th Cir. 2005). However, a federal habeas court "'may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied established federal law

13

erroneously or incorrectly.'"  *Lovitt*, 403 F.3d at 178 (quoting *Williams*, 529 U.S. at 411).  Rather, the state court's application of federal law must be unreasonable, not merely incorrect.  *Id.*; *see Nicolas*, 820 F.3d at 129 (The court "cannot disturb the State court's ruling simply because it is incorrect; it must also be unreasonable."); *Barnes*, 751 F.3d at 238-39 (a state court's decision is an unreasonable application of clearly established federal law when the state court identifies the correct governing principle but unreasonably applies that principle to the facts).

If a state prisoner's claim has already been adjudicated on its merits, § 2254 restricts federal habeas relief to limited circumstances.  One avenue is found in § 2254(d)(1).  Under that provision, the prisoner must show that the state court's determination "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1).

The Supreme Court has said, *Williams*, 529 U.S. at 407 (O'Connor, J., delivering the majority opinion with respect to Part II):

> [A] state-court decision can involve an "unreasonable application" of [the Supreme] Court's clearly established precedent in two ways.  First, a state-court decision involves an unreasonable application ... if the state court identifies the correct governing legal rule ... but unreasonably applies it to the facts of the particular state prisoner's case.  Second ... if the state court either unreasonably extends a legal principle from [the Supreme Court's] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply.

"Federal courts owe state tribunals 'significant deference' with respect to 'their determination that a state prisoner isn't entitled to habeas relief.'"  *Crockett*, 35 F.4th at 241 (citation omitted).  Therefore, under § 2254(d)(1), to be "unreasonable," the state court's application of that law must be "objectively unreasonable," not merely incorrect.  *Owens v. Stirling*, 967 F.3d 396, 411 (4th Cir. 2020).

The other means of relief is found in § 2254(d)(2).  It requires a prisoner to show that the state court proceedings "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2). *See Crockett*, 35 F.4th at 241.  In other words, the "federal court must conclude not only that the state court's determination was wrong, but that it was *unreasonable* in light of the evidence presented, that is, it is not 'debatable among jurists of reason.'"  *Merzbacher v. Shearin*, 706 F.3d 356, 368 (4th Cir. 2013) (emphasis in original) (internal citation omitted).

Again, under § 2254(d)(2), "a state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, 301 (2010).  "[E]ven if reasonable minds reviewing the record might disagree about the finding in question," a federal court may not conclude that the state court decision was based on an unreasonable determination of the facts.  *Id.*  This standard is "meant to be" one that is "difficult to meet…"  *Richter*, 562 U.S. at 102.

## IV.     Discussion

### A.  Procedural Default

To exhaust a claim properly, the petitioner must present "both the operative facts and the controlling legal principles associated with each claim."  *Mahdi v. Stirling*, 20 F.4th 846, 892 (4th Cir. 2021).  If a state court would dismiss claims for procedural failures, such claims are technically exhausted because, in the habeas context, "state-court remedies are . . .  exhausted" when they are no longer available regardless of the reason for their unavailability.  *Shinn v. Ramirez*, 1452 S.Ct. 1718, 1732 (2022).

Where a petitioner has failed to present a claim to the highest state court with jurisdiction to hear it, whether it be by failing to raise the claim in postconviction proceedings or on direct

appeal, or by failing to timely note an appeal, the procedural default doctrine applies.  *See Coleman v. Thompson*, 501 U.S. 722, 749-50 (1991) (failure to note timely appeal); *Murray v. Carrier*, 477 U.S. 478, 489-91 (1986) (failure to raise claim on direct appeal); *Murch v. Mottram*, 409 U.S. 41, 46 (1972) (failure to raise claim during postconviction); *Bradley v. Davis*, 551 F. Supp. 479, 481 (D. Md. 1982) (failure to seek leave to appeal denial of postconviction relief).  A procedural default also may occur where a state court declines "to consider the merits [of a claim] on the basis of an adequate and independent state procedural rule."  *Yeatts v. Angelone*, 166 F.3d 255, 260 (4th Cir. 1999).

The Fourth Circuit explained in *Breard v. Pruett*, 134 F.3d 615, 619 (4th Cir. 1998):

If a state court clearly and expressly bases its dismissal of a habeas petitioner's claim on a state procedural rule, and that procedural rule provides an independent and adequate ground for the dismissal, the habeas petitioner has procedurally defaulted his federal habeas claim.  *See Coleman v. Thompson*, 501 U.S. 722, 731-32 (1991). A procedural default also occurs when a habeas petitioner fails to exhaust available state remedies and "the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred."  *Id*. at 735 n.1.

If a procedural default has occurred, a federal court may not address the merits of a state prisoner's habeas claim unless the petitioner can show (1) both cause for the default and prejudice that would result from failing to consider the claim on the merits, or (2) that failure to consider the claim on the merits would result in a miscarriage of justice, *i.e.*, the conviction of one who is actually innocent.  *See Murray*, 477 U.S. at 495-96; *Breard*, 134 F.3d at 620.

"Cause" consists of "'some objective factor external to the defense [that] impeded counsel's efforts' to raise the claim in state court at the appropriate time."  *Breard*, 134 F.3d at 620 (quoting *Murray*, 477 U.S. at 488); *see United States v. Green*, ___ F.4th ___, 2023 WL 3470910, at *6 (4th Cir. May 16, 2023) (discussing 28 U.S.C. § 2255).  Cause exists when the defaulted claim was "so novel that its legal basis [was] not reasonably available to counsel."  *Bousley v.*

*United States*, 523 U.S. 614, 622 (1984) (quotations and citation omitted).  To establish prejudice, a petitioner must show that the default has "constitutional dimensions."  *Murray*, 477 U.S. at 494. Even where a petitioner fails to show cause and prejudice for a procedural default, a court must still consider whether it should reach the merits of a petitioner's claims in order to prevent a fundamental miscarriage of justice.  *See Schlup v. Delo*, 513 U S. 298, 314 (1995).

Habeas petitioners may use an actual innocence claim to excuse the procedural default of a separate constitutional claim upon which they request habeas relief.  *See Murray*, 477 U.S. at 496.  Notably, "'actual innocence' means factual innocence, not mere legal insufficiency." *Bousley*, 523 U.S. at 623; *see United States v. Pettiford*, 612 F.3d 270, 282 (4th Cir. 2010).

"[When] a constitutional violation has probably resulted in the conviction of one who is actually innocent, a federal habeas court may grant the writ even in the absence of a showing of cause for the procedural default."  *Murray*, 477 U.S. at 496; *see also Reid v. True*, 349 F.3d 788, 806 (4th Cir. 2003).  A petitioner who wishes to use a claim of actual innocence as a gateway to raising an otherwise defaulted constitutional claim must demonstrate by a preponderance of the evidence that a reasonable juror could not have convicted the petitioner in light of the new evidence.  *See Buckner v. Polk*, 453 F.3d 195, 199-200 (4th Cir. 2006).

In Ground One, Dame alleges that the trial court erred and/or abused its discretion in allowing the prosecutor to cross-examine Dame about a text message that the prosecutor knew was not admissible as evidence.  ECF 1 at 2.  Dame claims that his right to due process was violated because the trial court did not adhere to state law.  *Id*.

To be clear, Dame argued on direct appeal that the trial court committed error in allowing the testimony regarding the text messages.  However, Dame framed this claim solely as a state law evidentiary issue, not as a violation of his right to due process.  Here, Dame contends that his

arguments regarding the admissibility of this evidence by their very nature included a claim that his right to due process was violated (ECF 11 at 3-6), but no such due process argument was advanced on Dame's direct appeal.  ECF 5-1 at 42-53.

Further, in rejecting this allegation of error, the Maryland Court of Special Appeals relied on the Maryland Rules of Evidence and Maryland State court decisions regarding the admissibility of evidence. ECF 5-1 at 109-15.  To the extent Dame's claim rests on the failure of the trial court to follow state evidentiary law, his claim is not cognizable.  In considering a challenge to a state evidentiary ruling, this Court does not "review the admissibility of evidence under state law unless erroneous evidentiary rulings were no extreme as to result in a denial of a constitutionally fair proceeding." *Barbe v. McBride*, 521 F.3d 443, 452 (4th Cir. 2009) (internal citation and quotation omitted).

As discussed, "it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions.  In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Estelle*, 502 U.S. at 67-68.

To the extent that Dame now asserts a separate claim that his right to due process was violated, that claim is procedurally defaulted, because Dame did not put forth that argument before the State courts. When a claim has not been properly exhausted, the court may find that there is an "absence of available State corrective process" under § 2254(b)(1)(B)(i) if it is clear that the unexhausted claim is procedurally barred by state law and, as such, its presentation in the state forum would be futile. *Coleman*, 501 U.S. at 735 n.1 (finding that a procedural default occurs when a habeas petitioner fails to exhaust available state remedies and "the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement

would now find the claims procedurally barred") (citations omitted).  In Maryland, a criminal defendant is limited to one post-conviction proceeding, which, once finally resolved, cannot be reopened unless necessary "in the interests of justice." Md. Code, Crim. Proc. §§ 7-103(a), 7-104; *see also id*. § 7-102 (providing that a post-conviction claim is subject to waiver); § 7-106(b)(2) (providing that a rebuttable presumption arises that a petitioner has knowingly and intelligently waived an allegation when the petitioner defaults upon the allegation in a prior post-conviction proceeding).  Because Dame did not present his due process claim to any state court and it may no longer be raised in any form of state post-conviction proceeding, the claim is procedurally barred.

The court must consider whether Dame has established the applicability of any exceptions to the procedural default rule that would allow the claim to proceed.  The court sees none. Dame's response to the procedural default argument was a blanket denial that Respondent's arguments for procedural default were correct.  ECF 11 at 3-6.  Dame has offered nothing to establish that a fundamental miscarriage of justice would result if this Court does not reach the merits of the defaulted claim.

Although Dame baldly asserts in his response that he is actually innocent (ECF 11 at 3), he has not  provided any credible evidence demonstrating that he is actually innocent of the offenses of which he had been convicted.  *See Schlup*, 513 U.S. at 316.  Dame's statement falls short of the "exacting standard for actual innocence … sufficiently alleging and providing new evidence of a constitutional violation and … demonstrating that the totality of the evidence, both old and new, would likely fail to convince any reasonable juror of his guilt beyond a reasonable doubt." *Finch v. McCoy,* 914 F.3d 292, 302 (4th Cir. 2019).  Therefore, the court finds that Dame's first claim is procedurally defaulted.  I decline to consider his Petition as to that claim.

### B.  Ineffective Assistance of Counsel

The record demonstrates that Dame exhausted each of his claims of ineffective assistance of counsel as well as his claim that he is entitled to relief due to the cumulative error of trial counsel.  The claims were presented to the circuit court in Dame's post-conviction petition (ECF 5-1 at 145) and included in his application for leave to appeal to the Maryland Court of Special Appeals (ECF 5-1 at 202-11).

Respondents argue that "the state post-conviction court correctly identified and applied *Strickland* as the controlling law in considering and denying each of Dame's claims of ineffective assistance of trial counsel.  The state court's decision is supported by the record and entitled to deference under AEDPA review.  Dame's claims state no basis for federal habeas relief."  ECF 5 at 34.

The Sixth Amendment to the Constitution guarantees a criminal defendant the effective assistance of counsel.  *Strickland v. Washington*, 466 U.S. 668, 686 (1984); *see also Buck v. Davis*, 580 U.S. 100, 118-19 (2017); *United States v. Morris*, 917 F.3d 818, 823 (4th Cir. 2019).  Ineffective assistance of counsel is a well recognized basis for postconviction relief.  *See generally Missouri v. Frye*, 566 U.S. 133 (2012); *Lafler v. Cooper*, 566 U.S. 156 (2012); *Padilla v. Kentucky*, 559 U.S. 356 (2010).

To mount a successful challenge based on a Sixth Amendment claim of ineffective assistance of counsel, a petitioner must satisfy the two-pronged test set forth in *Strickland*, 466 U.S. at 687-88.  *See Williams v. Taylor*, 529 U.S. 362, 390 (2000); *United States v. Winbush*, 922 F.3d 227, 229 (4th Cir. 2019); *United States v. Carthorne*, 878 F.3d 458, 465 (4th Cir. 2017); *United States v. Powell*, 850 F.3d 145, 149 (4th Cir. 2017).  First, the petitioner must show that counsel's performance was deficient.  Second, the petitioner must show that he was prejudiced by

the deficient performance. *Strickland*, 466 U.S. at 687; *see Buck*, 580 U.S. at 118-19 *Chaidez v. United States*, 568 U.S. 342, 348 (2013); *Roe v. Flores-Ortega*, 528 U.S. 470, 477 (2000); *Hill v. Lockhart*, 474 U.S. 52, 57 (1985); *Winbush*, 922 F.3d at 229; *Powell*, 850 F.3d at 149; *United States v. Rangel*, 781 F.3d 736, 742 (4th Cir. 2015); *United States v. Dyess*, 730 F.3d 354, 361 (4th Cir. 2013); *Richardson v. Branker*, 668 F.3d 128, 139 (4th Cir. 2012); *United States v. Higgs*, 663 F.3d 726, 735 (4th Cir. 2011); *see, e.g., United States v. Baker*, 719 F.3d 313, 318 (4th Cir. 2013).

The first prong is known as the "performance prong," which relates to professional competence. The petitioner must demonstrate that his attorney's performance fell "below an objective standard of reasonableness," as measured by "prevailing professional norms." *Strickland*, 466 U.S. at 688; *see Richter*, 562 U.S. at 104; *Powell*, 850 F.3d at 149. The central question is whether "an attorney's representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom." *Richter*, 562 U.S. at 88 (quoting *Strickland*, 466 U.S. at 690).

The Supreme Court has made clear that the "first prong sets a high bar." *Buck*, 580 U.S. at 118; *see also Powell*, 850 F.3d at 149. In *Padilla*, 559 U.S. at 371, the Court said: "Surmounting *Strickland's* high bar is never an easy task." Notably, a "lawyer has discharged his constitutional responsibility so long as his decisions fall within the 'wide range of professionally competent assistance.'" *Buck*, 580 U.S. at 118. Consequently, the performance prong is "'difficult'" to establish. *Lawrence v. Branker*, 517 F.3d 700, 709 (4th Cir. 2008) (quoting *James v. Harrison*, 389 F.3d 450, 457 (4th Cir. 2004)).

To satisfy the high bar, the burden is on the petitioner to establish "'that counsel made errors so serious that his "counsel" was not functioning as the "counsel" guaranteed by the Sixth Amendment.'" *Richter*, 562 U.S. at 88 (quoting *Strickland*, 466 U.S. at 687). Notably, "the

*Strickland* standard must be applied with scrupulous care," *Richter*, 562 U.S. at 105, and "the standard of judging counsel's representation is a most deferential one." *Id.* Indeed, "[k]eenly aware of the difficulties inherent in evaluating counsel's performance, the Supreme Court has admonished that courts 'must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'" *Lawrence*, 517 F.3d at 708 (quoting *Strickland*, 446 U.S. at 689); *see Cullen v. Pinholster*, 563 U.S. 170, 189 (2011); *Richter*, 562 U.S. at 104; *Lee v. Clarke*, 781 F.3d 114, 122 (4th Cir. 2015).

Second, the petitioner must show that his attorney's deficient performance "prejudiced [his] defense." *Strickland*, 466 U.S. at 687. To satisfy the "prejudice prong," a petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694; *see also Buck*, 580 U.S. at 119; *Lafler*, 566 U.S. at 163; *Lockhart v. Fretwell*, 506 U.S. 364, 369-70 (1993). "A reasonable probability is a probability sufficient to undermine confidence in the outcome" of the proceedings. *Strickland*, 466 U.S. at 687. However, a petitioner is not entitled to post conviction relief based on prejudice where the record establishes that it is "not reasonably likely that [the alleged error] would have made any difference in light of all the other evidence of guilt." *Berghuis v. Thompkins*, 560 U.S. 370, 390 (2010).

A court "need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies." *Id.* at 697. Nor must a court address both components if one is dispositive. *Jones v. Clarke*, 783 F.3d 987, 991 (4th Cir. 2015). This is because failure to satisfy either prong is fatal to a petitioner's claim. As a result, "there is no reason for a court . . . to address both components of the inquiry if the defendant makes an insufficient showing on one." *Strickland*, 466 U.S. at 697.

1.      Failure to object to the "Golden Rule" argument

Here and in his postconviction application, Dame has alleged that his trial counsel was ineffective because he failed to object to the prosecutor's "Golden Rule" argument.  ECF 1 at 3; ECF 5-1 at 159-61.  Dame contends that on three occasions during closing arguments, the prosecutor made impermissible arguments to the jury and that on each occasion his trial counsel failed to object.

The postconviction court dismissed the claim.  It reasoned, in part, as follows, ECF 5-1 at 193-95:

> During the trial, the main witnesses for the State were V.M. and her sister, I.D., who testified to events she saw happen to V.M. when I.D. was 11 or 12 years old.  I.D. walked in on the Petitioner sexually assaulting V.M. one day after Petitioner did not lock V.M.'s door.  I.D. did not tell anyone but the Petitioner what she saw.  The failure to report by I.D. was used by the defense to attack her credibility.  Trial Tr. 2424-20.  This testimony was the only corroborating evidence to V.M.'s claims.
>
> A "golden rule" argument is one which asks jurors to put themselves in a victim's shoes, thereby encouraging jurors to abandon their oaths to be nonpartisan and instead consider their own personal interests when determining their verdicts.  *Lawson v. State*, 389 Md. 570, 594 (2005).  Defense at trial raised the question of why I.D. did not report what she saw, even though she claims to have known it was inappropriate behavior.  During closing argument, the State addressed the jury in an effort to salvage the credibility of I.D. and support her choice not to report until a later date.  There are three different arguments made during the State's closing, which Petitioner believes to be objectionable "golden rule" arguments.
>
> > First the State asks the jury to think as a 12- year-old girl.
> >
> > Try to wrap your brain around that.  You are a 12-year-old.  You walk into the basement and you see your Dad with his face between your sister's legs and she has no clothes on.
>
> Verdict Tr. 22:22-25. The State next asks the jury to look at the situation from I.D.'s perspective.
>
> > So you got to look at the situation and look at her [I.D.] and say to yourself, okay, you know, or look at the kids in your life.  Think of

all of the 10-year old kids that you know.  You think they are going
to go running and telling? Some do.  Some don't.

Verdict Tr. 41:16-21.  Thirdly, the prosecutor told jurors, "You have to look at this
in terms of how does a child handle this?" Verdict Tr. 42:11-12.

Petitioner alleges the jury was biased and put into a position of a young girl
which, as a result, gave more weight to the [sic] I.D.'s testimony.  An attorney may
not "implore the jurors to consider their own interests and therefore violate the
prohibition against the 'golden rule' argument."  *Holmes v. State*, 119 Md. App.
518, 527 (1998).  The Court in *Lawson* included these "golden rule" arguments as
improper arguments to jurors, stating "when a jury is asked to place themselves in
the shoes of the victim, the attorney improperly appeals to their prejudices and asks
them to abandon their neutral fact finding role." *Lawson v. State*, 389 Md. 570, 594
(2005).   In *Holmes*, the prosecutor improperly asked the jury to convict the
Defendant so he would "stop spreading poison on the streets."  Here, the prosecutor
asked the jury to think back to being 10 years old when judging the credibility of
I.D.'s testimony.  Asking the jury to think "how does a child handle this" was, as
the prosecutor stated, a way to help the jury "wrap their brains around this."  Verdict
Tr. 22:22-25.  The prosecutor was not asking the jury to put themselves into I.D.'s
shoes or asking them to think about how the verdict would affect them personally,
as was asked in *Holmes*.  The prosecutor, instead, was building support in his
closing argument to why I.D. testified the way she did.

During closing argument "both the State's Attorney and defense counsel are
given wide latitude in the conduct of closing argument." *Trimble v. State*, 300 Md.
387, 405 (1984).  During the trial, I.D.'s credibility was attacked.  The State
highlighted her age and relationship to the Petitioner as relevant factors to address
the reasoning behind I.D.'s failure to report.  Even if the trial counsel for Petitioner
objected to the arguments, the objection would likely have been overruled as the
State did not make any comment during the closing that would have "misled the
jury or [was] likely to have misled or influenced the jury to the prejudice of the
accused." *Degren v. State*, 352 Md. 400, 431 (1999).

"[T]he presumption of innocence, although not articulated in the Constitution, is a basic

component of a fair trial under out system of criminal justice." *Estelle v. Williams*, 425 U.S. 501,

503 (1976).  Habeas relief is available for prosecutorial misconduct only when the prosecutor's

conduct is so egregious in the context of the entire trial that it renders the trial fundamentally unfair.

*Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (citation omitted).

24

In order to demonstrate ineffective assistance of counsel arising from failure to object to the prosecutor's closing argument, the Petitioner must show that the prosecutor's comments "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *United States v. Lightly*, 616 F. 3d 321, 359 (4th Cir. 2010) (quoting *United States v. Wilson*, 135 F. 3d 291, 297 (4th Cir. 1998)).  Further, a "golden rule" argument does not constitute reversible error where no prejudice arises from the prosecutor's comment." *Ins. Co. of N. Am. v. U.S. Gypsum Co.*, 870 F. 2d 148, 154 (4th Cir. 1989); *Brown v. Cartledge*, Civil Action No. 9:09-2254-JFA-BM, 2010 WL 3733858 * 6  (D.S.C. June 10, 2010).

The postconviction court did not find that the prosecutor's statements constituted "Golden Rule" arguments and also found that the prosecutor's closing argument did not prejudice Dame.  I agree.  The prosecutor's remarks during closing argument make it clear that he was simply asking the jury to consider the ages of V.M. and her sister in determining their credibility and behavior in how they each reported the abuse.  Because the argument was proper, there was no error in trial counsel's failure to object.

Dame has not established that the postconviction court's ruling was contrary to or an unreasonable application of *Strickland* or any other federal law.  Before directly addressing Dame's "Golden Rule" claim, the postconviction court properly cited and explained the requirements of *Strickland. Id.* at 191-92.  The postconviction court's application of the ineffective assistance standard and analysis of the prosecutor's closing argument does not constitute an error beyond the possibility of fair-minded disagreement.  Rather, the court examined the record to determine whether trial counsel's performance was deficient and concluded that Dame's arguments were unsupported by the relevant portions of the trial transcript.  Based on that finding,

the post-conviction court correctly determined that trial counsel's performance was not constitutionally deficient when counsel failed to object to the prosecutor's closing argument.

The postconviction court's determination is entitled to deference. Dame has failed to sustain his burden to show prejudice under *Strickland*.

       2.      Failure to object to questions regarding Dame's arrest

Dame asserts that his counsel was ineffective because he did not object to the prosecutor's solicitation of information from Detective Norman regarding Dame's arrest at Dulles airport. ECF 1 at 3. The following exchange between the prosecutor and Detective Norton occurred, ECF 6-2 at 79:

> Q. Detective, did there come a period of time where you were able to apprehend the Defendant?
>
> A. Yes, sir.
>
> Q. And where was that?
>
> A. Dulles airport, I guess that would be considered Virginia, or outside of Virginia.

The postconviction court found that trial counsel did not err in his failure to object to the question and the exchange was not prejudicial to Dame because his arrest occurred when he was returning from a trip out of the country, freeing the exchange from any inference that Dame was fleeing. ECF 5-1 at 195. The postconviction court's decision is supported by the record. The victim testified that she had not reported the abuse due to her fear of Dame. Evidence presented at trial demonstrated that Dame left the country for several months to tend to business, but when his return was imminent V.M. told her mother of the abuse.

The fact that Dame was arrested at Dulles airport did not prejudice Dame. The postconviction court's findings withstand scrutiny.

       3.      Failure to object to the prosecutor's repetitive questioning

Dame next alleges his trial counsel erred in failing to object to the prosecutor's repetitive questioning of witnesses. ECF 1 at 4. The postconviction court considered and rejected this contention, examining several portions of the trial transcript that Dame alleged demonstrated the cumulative and therefore prejudicial testimony.

The postconviction court determined that pursuant to Md. Rules 5-403 and 5-611(a), the questioning was proper and therefore no objection was necessary and no prejudice accrued to Dame.  ECF 5-1 at 195-96.  Specifically, the postconviction court found that the prosecutor's questioning of V.M, was not repetitive, rather only V.M.'s answers were repeated and the prosecutor was attempting to return the witness to the topics of the prosecutor's direct examination. *Id*. at 196-97.  The postconviction court also noted that because the abuse occurred over several years it was necessary for the prosecutor to ask similar questions to focus and establish what type and time frame of abuse V.M. was describing during her direct testimony.  *Id*. at 197.

To the extent the prosecutor asked repetitive questions, the postconviction court determined it was also permissibly done to expand on previous topics addressed by V.M. and to establish Dame's harassment of V.M.  *Id*. at 197.   In reviewing all of the testimony, the postconviction court determined that, "At most, the failure to object could be viewed as harmless error.  The questioning was intended to keep the witness and jury on track and clear as to which phase of abuse was being discussed."  *Id*. at 198.

The postconviction court accurately recounted the facts and the law as to the examination of the witnesses.  There is no basis to disturb the postconviction court's findings.

4.    Trial Counsel was ineffective for failing to object to prosecutor's improper cross examination

Dame contends that trial counsel was ineffective when he failed to object to the prosecutor's questioning of Dame, which Dame contends was outside the scope of his direct

examination, and when the prosecutor suggested the existence of a fact not in evidence.  ECF 1 at 4-5.  Specifically, Dame claims that V.M. did not discuss in her testimony using pornography as part of  the "process" that Dame was employing to "make" V.M. heterosexual.  Therefore, Dame alleges that cross-examining him about the use of pornography was improper.

During trial, Dame's counsel entered into evidence a printout of the curriculum from a website Dame used for the "process."  Dame admitted during his testimony that he used the website and the curriculum.  Given that admission and that the website referenced viewing pornography, the postconviction court found that the cross-examination of Dame was relevant and within the scope of proper cross-examination. ECF 5-1 at 199.

The postconviction court's statements regarding the evidence introduced at trial are supported by the record.  There is no error in failing to object to proper cross-examination.  Dame cannot meet his burden of proof that his trial counsel was ineffective for failing to object to the cross-examination of him regarding the use of pornography.  *See Smith v. Robbins*, 528 U.S. 259, 286 (2000) (the burden is on a habeas petitioner to meet both prongs of the *Strickland* test).

5.     Cumulative error

Dame argues that he is entitled to relief based on the cumulative errors of trial counsel. ECF 1 at 3. "Pursuant to the cumulative error doctrine, the cumulative effect of two or more individually harmless errors has the potential to prejudice a defendant to the same extent as a single reversible error." *United States v. Basham*,  561 F.3d 302, 330 (4th Cir. 2009) (internal quotation marks omitted).

In the Fourth Circuit, the cumulative error doctrine is not generally recognized because "legitimate cumulative-error analysis evaluates only the effect of matters actually determined to be constitutional error, not the cumulative effect of all of counsel's actions deemed deficient."

*Fisher v. Angelone*, 163 F.3d 835, 852 n. 9 (4th Cir. 1998); *see also Arnold v. Evatt,* 113 F.3d 1352, 1364 (4th Cir. 1997); *Higgs v. United States*, 711 F. Supp. 2d 479, 552 (D. Md. 2010) (in the context of collateral review, review based on the cumulative effect of errors is available only where individual constitutional errors are found).   Having found no errors of constitutional dimension, I find no basis for engaging in cumulative-error analysis.

There is no merit to Dame's assertion that he is entitled to relief based on cumulative error.

### V.   Certificate of Appealability

Rule 11(a) of the Rules Governing Section 2254 Cases provides that the district court "must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Because the accompanying Order is a final order adverse to the applicant, 28 U.S.C. § 2253(c)(1) requires issuance of a certificate of appealability ("COA") before an appeal can proceed.

A certificate of appealability may issue if the prisoner has made a "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). When a district court rejects constitutional claims on the merits, a petitioner may satisfy the standard by demonstrating that "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). When a petition is denied on procedural grounds, the petitioner may meet the standard by showing that reasonable jurists "would find it debatable whether the petition states a valid claim of the denial of a constitutional right" and "whether the district court was correct in its procedural ruling." *Id.*

Dame has failed to satisfy this standard on any of his claims.   Therefore, a COA shall not issue.[2]

---

[2] Although this court declines to issue a certificate of appealability, this does not preclude Dame from seeking a COA from the Court of Appeals for the Fourth Circuit.

## VI.    Conclusion

For the foregoing reasons, the court will deny Dame's petition for writ of habeas corpus.

The court also declines to issue a COA.  A separate Order follows.


    May 26, 2023
Date

    /s/
Ellen L. Hollander
United States District Judge